PITMAN, J.
■ hPlaintiffs, the Succession of Scott B.. Roberson,[1] Gloria D. Roberson and Craig E. Roberson, appeal the judgment of the trial court which dismissed Defendant Gary Carlisle from the petitory action regarding certain lots in Claiborne Parish and finding that his tract of land, Lot 1, was not located within the boundaries .of Plaintiffs’ land. Further, Plaintiffs appeal another judgment which found that Defendants, E.W. Chance, III, and mother, Evelyn Chance, were owners of the disputed Lot 2 by virtue of 10 years’ acquisitive prescription.[2] For the following reasons, the judgments of the trial court are affirmed.

FACTS

Plaintiffs filed a petitory action against Defendants alleging that they are the owners of a tract of land located in the SW 1/4 of the NW 1/4 of Section 5, Township 20 North,. Range 5 West (and a-portion of Section 6 which is not relevant to this inquiry), which contains 46 acres of land, less and except Lots 1, 2 and 3 of the Willie Moore: Subdivision and a .2-acre servitude. •■Plaintiffs claim their ancestor in title is Charles Williams, who sold the property to Willie Moore in 1941. They attached a cbpy of a plat prepared by Benjamin Winn of Winn Surveying and Engineering, LLC, dated September 8, 2010. Théy also alleged that Defendants were ^trespassing upon their property without a good and valid title and without any right to possession and that they had refused to deliver possession of the property to them without any good or legal cause for such refusal.
Defendants filed an exception of vagueness because Plaintiffs had failed to specify, where the alleged trespass was taking place. After stipulations by the parties, the property in question was determined to be the southeast portion of the property belonging to Plaintiffs. The exception was withdrawn. Defendants filed a joint answer denying the allegations of the petition.
Defendant E.W. Chance filed an exception of nonjoinder of party and claimed that his mother, Evelyn Chance, held an interest in the subject property pursuant to a donation inter vivos executed in 2008 by her husband (Ed Chance, Jr.), donating *206 his community interest in the property to her. The Chances[1] provided documentation to support this claim and argued that they held just title to the property and that the alleged ownership of the property at issue was derived from a common ancestor with Plaintiffs, Charles Williams, who apparently sold tracts of property to both the Plaintiffs’ ancestor .in title, Willie Moore, and the Chances’ ancestor in title, N.Y. Crawley, who purchased property from Mr. Williams in 1966.[3] Mr. Crawley began developing the property by building fences and | .(¡dividing it into seven separate lots. He sold Lot 2 to Shirley and Frances Hughes in 1968. The deed was not recorded until 1971. In 1983, the Hughes-es sold Lot 2 to David and Terry Felker, who held the property until 1992, when they tried to sell it and discovered that there was an error in’ the legal description of the property. As it had been in the deed to the Hugheses, the lot was described as being in the SE 1/4 of the NW 1/4. For that reason, they sued the Hugheses to rescind the sale and a survey was done by James Wooten on April 6, 1994. The Hugheses settled with the Felkers, and the property was returned to them by quitclaim deed dated July 15, 1996. After the sale of Lot 2 to the Felk-ers was rescinded, the Hugheses sold it to the Chances in 2005.
The Chance Defendants alleged that, after Ed Chance, Jr., died, the judgment of possession in his succession erroneously placed his heirs, E.W. Chance, III, and John Dumas Chance, in possession of Lot 2. Based on the foregoing, Plaintiffs amended their petition to include Evelyn Chance as a defendant. In their answer to the amended petition, the Chances pled the affirmative defenses of estoppel' by deed and ten-year acquisitive prescription. They filed a motion for summary judgment claiming the Hugheses had acquired their lot through 10- and 30-year acquisitive prescription. The trial court denied the motion.
The trial began with the testimony of Benjamin Winn, surveyor, who drew the plat dated September 8, 2010, and which shows Lot 2 of the N.Y. Crawley Subdivision located in the southeast corner of Plaintiffs’ property, above the section line, partially within, and partially outside of, Plaintiffs’ L property line on Lake Claiborne. Mr. Winn testified that he performed a “section control retrace survey” to define the section lines into its quarters and quarter-quarters. He stated that he referred to a survey of the Willie Moore Subdivision, prepared by Doyle Sanders, and included the three lots in that subdivision. He admitted that, on the plat he drew, he had reversed the order of the lot numbers. Lot 3 should have been the northernmost lot and Lot 1 the southernmost. He testified that' the lots of the N.Y. Crawley Subdivision were taken from the assessor’s map, the listings with- the metes and bounds descriptions and evidence on the ground, although there was conflicting evidence. He marked on the plat where he found marker pins and plotted the Crawley Subdivision accordingly, even though there was confusion in the deeds he was given and the fact that he would not have plotted them there.
Mr. Winn further testified that he considered a plat of the NY. Crawley Subdivi *207 sion he. had obtained froto the Claiborne Parish tax assessor’s office. He stated that he used that plat, and the metes and bounds descriptions and evidence on the ground, including corner marker pins, to achieve his best depiction of where Lots 1, 2 and 3 were located. He further stated that, even though the deeds reflected that the property at issue was located- in the wrong quarter, “I have to do what our board tells us to do, so there was visible indications of somebody acquiring rights right there [.] ”
Plaintiffs questioned Mr. Winn about a map hé had retrieved from the assessor’s office which showed “one more lot,” and Defendants’ |sattorney stated it wás an older map.[4] Mr. Winn responded, “that would make sense because we actually found corner pins south of here that I show on my plat that I couldn’t account for at the time.” He stated that he looked for improvements and found mobile homes and buildings, replying, “The building to the south that we tied in was actually in the next Quarter-Quarter.”[5]
Mr. Winn further testified- that he was able to determine the location of Lot 2 of the N.Y. Crawley Subdivision by using the metes and bounds description and by looking at the map he had from the assessor’s office, which only showed Lots 1 and 2. Regarding the plat he drew, he stated, “there’s two corner pins south of where I show Lot 1. This whole thing could actually be shifted down to where there was a 3 in the place of Lot 2.” Mr. Winn admitted the rnet'es and bounds description of Lot 2 could be followed and Lot 2 could be physi-eally located below Lot 3; which was bordered on the north by Liberty Hill Road, and the starting point for measuring Lot 2 would begin 83 feet south of the southeast corner Of Liberty'-Hill Church Road and along the waterline-of Lake Claiborne. He further stated that he had the lot located in the wrong place on his survey—“I miss plotted (sic )■ them because I didn’t have what you have. I had an older one. Actually, 3 is where 2 is, 2 is where 1 is, and 1 is below that.” Regarding Lot 2, he admitted he had “messed up” and “put it too far north.”
| fiWith prompting from Mr. Carlisle’s attorney,’ Mr. Winn testified that, based on the evidence shown him that day, Lot 1, which Mr. Carlisle owned, was located outside the area covered-by Plaintiffs’ legal description, which was all the property located within the blue line on the plat Mr. Winn had drawn. He stated that Lot 1 would be outside of the line “in the next Quarter-Quarter, actually.” He also stated that Lake Claiborne was built in the 1960s and that Horse Creek, to which certain documents refer as the eastern boundary to which Liberty Hill Road ran, was covered by water when the lake wás created. Therefore, Horse’ Creek was no longer á viable landmark.
E.W. Chance, III, testified that his parents bought the property from the Hugheses and that, at the time of the hearing, a blue building, camp, boat shed, boat launch, boat pier and patio were located on the property. He stated that he and Mr. Carlisle access their respective camps from Liberty Hill Road.[6] Mr. Car- *208 lisle’s camp is directly south of his. He also testified that, when his parents bought the lot in 2005, they showed him where the metal rod markers were placed, and he has maintained -the property since they acquired ownership, with no interruption of possession. . .
Mrs. Frances Hughes testified that she and her husband owned Lot 2 of the N.Y. Crawley Subdivision from 1968 until 1983, a period greater than 15 years, when they sold it to the Felkers. Eleven years later, they Lreacquired the lot by quitclaim deed.[7] She also testified that, while the Felkers owned the property, she never went there and did not know how they used it while it was in their possession. She stated that, when she and her husband reacquired the property, the trailer they had previously placed there had been burned, and all that was left was a gas can and a fire-damaged trailer. The Hugheses cleaned the site, landscaped and built a new camp.
Mrs. Hughes further testified that, when she and her husband sold the camp to the Chances, they showed them the property lines, how the property was divided and where the marker stakes were located. She stated that they told the Chances there had been a lawsuit, but that they had had the property resurveyed to assure that all the measurements were correct, and the surveyor had placed markers on the trees and tags on the stakes. She stated that Mr. Chance had’ also hired an attorney to check title to assure it was clear.
Mrs, Hughes also testified that N.Y. Crawley is her brother-in-law and that he, she and her husband walked the property before Mr. Crawley sold it to them. Mr. Crawley had divided the property into lots, and the stakes delineating the .property lines were present when they bought Lot 2; these same stakes were still in place when they sold it to the Felkers and to the Chances. She stated that, immediately after purchasing , the property in 1968, they began making improvements, including building road access, made necessary by a lot -located in front of theirs off Liberty Hill Road. |¿There were three lots on the south side of the road and four lots on the north side of the road, and their lot was in the middle of the three lots on the south side. They also installed a septic-tank, placed a mobile home on the lot, drilled a well, built a concrete and screened-in porch across the front of the mobile home and built a pier.
Plaintiff Craig Roberson testified that, in 1979 or 1980, his parents bought two of the three lots of the Willie Moore Subdivision, which is located north of Liberty Hill Road. Approximately a year later, they bought the third lot, located on the corner, giving them complete ownership of the subdivision. At the time of that purchase, Mr. Moore ■ discussed the property lines with him and his father, Scott B. Roberson. They were made aware of encroachments on Mr. Moore’s property, but dismissed that information because it did not affect their land.
Mr. Roberson was questioned about a letter that was sent by the law firm of Kitchens, Benton, Kitchens & Pearce on December 11, 1980, to two attorneys, Mr. Madden and Mr. Stewart, which referenced Rev. W.W. Moore versus R.O. Wind-ham, and Messrs. Gant, Hughes and Car-lisle, which was admitted into evidence at trial. The letter stated that Paul Kitchens had examined the deeds of acquisition for each of the attorney’s clients and it was his *209 opinion that -there were mobile homes on the Moore property which were improperly located since the deeds state the land is in a portion of .the SE 1/4 of the NW1/4 of Section 5. No litigation was ever filed following this letter; and Mrs. Hughes, in earlier testimony, had stated that no one ever questioned their ownership of the land during their first ^period of, ownership. Although his family did not yet own the 46-acre tract, Mr. Roberson stated that it was after this letter was sent on behalf of Mr. Moore that the people who had mobile homes located on the property, both north and south of Liberty Hill Road, moved their mobile homes off the property- ■ f.
Mr. Roberson further stated that, in November 2008, his parents bought the remainder of Mr. Moore’s property so that they owned the 46-acre tract and the three lots of the Willie Moore Subdivision. He testified that Mr. Moore died and sometime around 1984, the Hugheses moved- a mobile home onto the land. It was not until 2005 that he discovered that Mr. Carlisle was back on the property.
Mr. Roberson also testified that, after Mr. Winn performed the survey of the property and placed flags on the boundaries, he believed the gate across the road that led to the Chance and Carlisle properties was located on his family’s land. When specifically asked whether the gate and driveway beyond wére located on the land hé and his parents owned, he responded that neither he nor his parents ever gave the Chances or Mr. Carlisle permission to use their - property. He agreed that the property Outlined-in blue and depicted on the survey by Mr. Winn reflected the 46.9 acres deeded to them by Mr. Moore. Because he believed the Chances and Mr. Carlisle were trespassing on his property, he sent them letters requesting that - they vacate the property.
A recess was taken; and, when court resumed, Plaintiffs’ attorney advised the trial court that he had tendered the witness. At that point, 110Mr. Carlisle’s attorney moved for involuntary -dismissal based on Mr. Winn’s testimony, that Lot 1 was not located within the boundaries of Plaintiffs’ property, Having listened to the testimony qf Mr. Winn and Mrs. Hughes and concluding that Mr. Carlisle’s Lot 1 was not located on Plaintiffs’ land, the trial court granted the involuntary dismissal of Defendant Carlisle over Plaintiffs’ objection, at which time Plaintiffs reserved the right to appeal the issue.
On cross-examination, Mr. Roberson testified that he had seen both the Felkers and the Hugheses on the property prior to 2010 when he allegedly had his attorney send letters to the Hugheses and Mr. Car-lisle. He also verified that his father’s deposition, which had previously been admitted into evidence, wasr taken when his father was suffering from some form of dementia or Alzheimers.
The parties filed post-trial memoranda, and the trial court rendered judgment on January 20, 2014, in favor of the Chances and against the Robersons, dismissing the Robersons’ claims with prejudice. The trial ' court' assigned - reasons for judgment, which concluded that the Hugheses purchased the property in 1968 and remained in continuous, uninterrupted possession of the property for a period in excess 'of ten years. It further concluded that the Hugheses took possession of the property in’ good faith. It noted that, 'although there was much dispute regarding whether the Hugheses had just title to the property, Plaintiffs’ expert witness, ■ Mr. Winn, testified that, based on -the metes and bounds description in the Hugheses’ deed, it was possible to physically locate the property boundaries. Because |nthe property was immovable property subject to *210 ownership through acquisitive prescription, the trial court concluded that the Chance Defendants had proven all four required elements for ten-year acquisitive prescription and ruled in their favor.
Further, the trial court noted that the Hugheses had also acquired the property through 30-year acquisitive prescription. It found that the letter, allegedly sent by Attorney Kitchens on behalf of Mr. Moore, was never' sent to or received by the Hugheses, and possession was never interrupted. For these reasons, Plaintiffs’ suit was dismissed at their cost. Plaintiffs appeal both the involuntary dismissal of Mr. Carlisle and the dismissal of their action against the Chance Defendants.

DISCUSSION

The Carlisle judgment of involuntary dismissal

Plaintiffs argue that the trial court erred in dismissing Mr. Carlisle from the suit based on the fact that the deed call of his property locates it in Lake Claiborne; and, as a result, he trespasses across their disputed land to access his tract. Plaintiffs argue that a deed describing a different quarter-quarter section from that in which th.e tract is actually located is not transla-tive of title and cannot serve as a basis for prescription. Therefore, any possession by a party other than the record owner is trespassing. For these reasons, Plaintiffs claim the trial court erred in ruling in Mr. Carlisle’s favor based only on the metes and bounds descriptions in their deeds.
Plaintiffs further argue that their expert, Mr. Winn, testified that, if his map had been prepared by deed only, none of the property described in [12the Craw-ley/Carlisle deed would be depicted on the 40 acres shown on the map of the SW 1/4 of the NW 1/4 because it defines the area as being in the SE 1/4 of the NW 1/4. They also argue that the trial court never reached the issue of acquisitive prescription with regard to the Carlisle tract because it involuntarily dismissed Mr. Car-lisle upon testimony that his tract was not even located in the disputed tract owned by Plaintiffs. They contend that Mr. Car-lisle continues to trespass across the disputed area to reach his property and the trial court’s judgment should be reversed and any future trespass should be prohibited.
Mr. Carlisle argues that, as to the merits, Plaintiffs’ own expert testified that his property, Lot 1, fell outside the area covered by Plaintiffs’ description. Plaintiffs faded to raise any argument with regard to this finding in their appellate brief; therefore, Mr. Carlisle contends that the issue has been abandoned. Further, Mr. Carlisle asserts that the argument raised by Plaintiffs, that he is trespassing on their property each time he traverses the servitude to his property, is a new issue that was never raised in the lower court in pleadings, opposition to a motion for summary judgment or in a motion for a new trial. Therefore, the issue was not preserved for consideration on appeal. Mr. Carlisle also argues that the Chances, owners of Lot 2, acquired their lot via acquisitive prescription; and, if any issue is to be raised regarding access to Lot 1 through Lot 2, it is an issue for them to raise. For these reasons, Mr. Carlisle claims the issue should not be addressed by this court.
11sLa. C.C.P. art. 1672(B) concerns involuntary dismissal and states as follows:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any .party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon *211 the facts and law, the plaintiff has shown no right to relief. ■ The. court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence;
A motion for involuntary dismissal requires the trial court to evaluate all of the evidence presented by plaintiffs and render a decision based: upon the preponderance of the evidence. King of Hearts, Inc. v. Wal-Mart Stores, Inc., 27,137 (La.App.2d Cir.8/23/95), 660 So.2d 524. An appellate court should not reverse an involuntary dismissal in the absence of manifest error, and there is no manifest error if there is a reasonable factual basis for the finding of the trial court. Silva v. Calk, 30,085 (La.App.2d Cir.12/10/97), 708 So.2d 418; Gray v. City of Monroe, 41,087 (La.App.2d Cir.5/17/06), 930 So.2d 1148.
La. C.C.P. art. 3653 states as follows:
To obtain a judgment recognizing his ownership of immovable property or real right therein, the plaintiff in a petitory action shall:
(1) Prove that he has acquired ownership from a previous owner or by acquisitive prescription, if the court finds that the defendant is in possession thereof; or
(2) Prove a better title thereto than the defendant, if the court finds that the latter is not in possession thereof.
When the titles of the parties are traced to a common author, he is presumed to be the previous owner.
| uAlthough Plaintiffs complain in their appellate brief that the trial court erred in granting the motion for involuntary dismissal based on the fact that Mr. Carlisle’s deed call placed his property in Lake Claiborne, the trial court actually dismissed Mr. Carlisle because it found that his Lot 1 was-not even located within the boundaries of the land claimed by Plaintiffs.- According to Plaintiffs’ own expert, Mr. Winn, the Carlisle property was located below the blue line on the plat which delineated Plaintiffs’ property. Mrs. Hughes’s testimony corroborated Mr. Winn’s testimony; by her statement that there were three lots located below Liberty Hill Church Road and that the Carlisle tract was the southernmost tract.
Since the trial court found, based on the evidence presented by Plaintiffs’ own expert; that the Carlisle lot was not located within Plaintiffs’ land, it makes no difference that Mr. Carlisle’s deed contains an incorrect property description. No matter where Mr. Carlisle’s land was actually located according to the description, if it is not within the boundaries of the land Plaintiffs claim, then, upon the facts and the law, Plaintiffs have shown no right to relief. For these reasons, Plaintiffs’ argument with regard' to the improper land description lacks merit.
Plaintiffs also argued in their appellate brief that the trial court erred in dismissing their claim against Mr. Carlisle without considering their assertion that he trespasses each time he drives across their-property (Lot 2) to get to Lot 1. While there was some testimony at trial about the location of the road, the trial court made no« specific findings with regard to the' road but, .instead, dismissed all of Plaintiffs’ claims against Mr. Carlisle. | ifjGenerally, appellate courts will not consider issues raised for the first time on appeal. Thomas v. Bridges, 13-1855 (La.5/7/14), 144 So.3d 1001; Politz v. Politz, 49,242 (La.App.2d Cir.9/10/14), 149 So.3d 805.
Upon the trial court’s decision to involuntarily dismiss Plaintiffs’ case against Mr. Carlisle, Plaintiffs did not ask for a new trial on any specific issue but simply re *212 served the right to appeal the dismissal. Therefore, this court will not consider an issue raised for the first time on appeal, and it is considered to have been waived.

The Chance judgment

Plaintiffs argue that the trial court erred in finding that the Hugheses owned the property through 10- and 30-year acquisitive prescription. They make the same argument in regard to Lot'2 (the Chance tract) as they did with Lot 1 (the Carlisle tract) that, by its deed call, Lot 2 should also be considered as located in Lake Claiborne. They contend that the requisites for acquisitive prescription in this case have not been met because just title does not exist when the property description places the property at issue in the wrong section. Further, Plaintiffs challenge the length of possession of the Chances’ ancestor in title, the Hughéses. They argue that the sale to the Felkers, which was eventually rescinded as a result of a lawsuit when the Felkers discovered their title was not clear, resulted in an interruption during the three years while the Felker lawsuit was pending. For these reasons, Plaintiffs claim. t)ie trial court erred in dismissing . their claims against the Chances, who were deemed to have acquired the property through acquisitive prescription of 10 and 30 years.
| ifiThe Chances argue that the trial court correctly found that all the elements necessary for acquisitive prescription of 10 and 30 years had been met and that they, and their ancestors in title, the Hugheses, possessed- the property in good faith, with just title for the required time period without interruption. They contend that, as long as thé metes and bounds description of the deed renders the land subject to location, the title to the property is just title. ■ ■ ■
La. C.C. art. 3475 provides that the requisites for acquisitive prescription of ten years are: possession of ten years, good faith, just title and a thing susceptible of acquisition by prescription. La. C.C. art. 3476 concerns the attributes of possession and states the possessor must have corporeal possession, or civil possession preceded by corporeal possession to acquire a thing by prescription. The possession must be continuous, uninterrupted, peaceable, public and unequivocal.
. For purposes of acquisitive prescription, a possessor is in good faith when he reasonably believes, in light of objective considerations, that he is the owner of the thing he possesses. La. C.C. art. 3480. It is sufficient, that possession has commenced in good faith; subsequent bad faith, does not prevent the accrual of prescription of ten years. La. C.C. art, 3482. Just title is a juridical act, such as a sale, sufficient to transfer ownership or another real right. La..C.C. art. 3483. The act must be written valid in form and filed for registry in the conveyance records of the parish in which the immovable is situated. Id.
In Ryan v. Lee, 38,352 (La.App.2d Cir.4/14/04), 870 So.2d 1137, writ denied, 04-1531 (La.10/1/04), 883 So.2d 991, this court stated that a title is just for purposes of acquisitive prescription when the deed is regular in form, is valid on its face and would convey the property if executed by the owner. Id., citing La. C.C. art. 3483 and O’Brien v. Alcus Lands Partnership Trust, 577 So.2d 1094 (La.App. 1st Cir.1991). The paper title relied upon by one seeking to establish ten-years’ acquisitive prescription must sufficiently describe the property so as to -transfer its ownership. ■ One must be able to identify and locate the property from the description in the deed itself or from other evidence which appears in the public records. O’Brien, supra, citing, Pure Oil Co. v. Skinner, 284 So.2d 608 (La.App. 2d Cir. *213 1973), rev’d on other grounds, 294 So.2d 797 (La.1974). A deed describing a different tract of land from the one in controversy is not translative of the land in controversy and, therefore, cannot serve as a basis for prescription. Ryan v. Lee, supra, citing Albert Hanson Lumber Co. v. Angelloz, 118 La. 861, 43 So. 529 (La.1907).
Mrs. Hughes’s testimony at trial showed that she and her husband bought the property from her brother-in-law, N.Y. Crawley, in 1968, and immediately began preparing the property for placement of a mobile home. They cleared the property, built a road because the property lacked access from Liberty Hill Church Road, installed a septic tank, landscaped and placed a mobile home there. She testified that they never moved the mobile home from the property. They owned'it until 1983, when they sold the property to the Felkers. She stated that the Felkers held the property until |1S1996 when they returned it to the Hugheses by quitclaim deed. They subsequently sold the property to the Chances in 2005.
Based on these facts, it is clear that the Hugheses established possession of the property and road for at least ten years dating from 1968 until 1983. In light of objective considerations, the Hugheses believed that they were the owners of the property and, therefore, possessed it in good faith.
The most important issue regarding the Hugheses’ ownership of the property is whether they had just title since the first paragraph of the property description seems to locate it in a section that is currently covered by Lake Claiborne. Both Plaintiffs and Defendants rely on Ryan v. Lee, supra, to assert that the property, description is either fatal to, or supports, respectively, their claims, to the property. While, in Ryan, this court did say that a deed describing a different tract of land from the one in controversy is not translative of the land in controversy and, therefore, cannot serve as a basis for prescription, it also said that one must be able to identify and. locate the property from the description in the deed itself-or from other evidence which appears in the public records.
The deeds involved in this matter do contain errors in the general description concerning in which part of a section they are located; however, because the metes and bounds descriptions can be easily and accurately followed as beginning at the southeast comer of Liberty Hill Church Road, distances can be measured and the boundaries of the properties can be located from the deed descriptions and by virtue of other physical evidence, |]9such as marker pins. The deed to Lot 2 is regular in form, valid on its face and would convey the property if executed by the owner. Therefore, the Hugheses had just title- to Lot 2 and could convey the property to the Chances.
Because this is immovable property, which is susceptible of ownership by acquisitive prescription, and the Hugheses possessed the property for greater than ten years, in good faith, with just title, the Chances also have acquired the property through acquisitive prescription. Therefore, Plaintiffs’ assignment of error is without merit.[8]

CONCLUSION

For the foregoing reasons, the judgment of the trial court in favor of Defendant Gary Carlisle and against Plaintiffs, Suc *214 cession of Scott B.- Roberson, Gloria D. Roberson and Craig E. Roberson, is hereby affirmed. The judgment in favor of Defendants, E.W. Chance, III, and Evelyn Chance, and against Plaintiffs,-Succession of Scott B. Roberson, Gloria D. Roberson and Craig E. Roberson, is also affirmed. Costs of this appeal are assessed against the Plaintiffs, Succession of Scott B. Roberson, Gloria D. Roberson and Craig E. Roberson.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, MOORE, PITMAN & GARRETT, JJ.
Rehearing denied.

. Plaintiff Scott Roberson died during the proceedings and his succession was substituted as a plaintiff in the suit.

. This case is fraught with problems as a result of improper legal descriptions in documents, improper and inaccurate maps upon which Plaintiffs relied, -the surveyor admitting the mistakes and the confusion caused by the improper numerical designation of lots. The description of the subject property is confusing because it is actually located in the SE 1/4 of the ’SW 1/4 of the NW 1/4 of Section 5, T 20 N, R 5 W, of Claiborne Parish. Some descriptions in acts translative of title -have the property located in the SE 1/4 of the NW 1/4 of the said section, township and range, omitting the second call of the SW 1/4, which would actually place the property in Lake" Claiborne. A few feet of Lot 2 are located in the SE 1/4 of the NW 1/4, but the remainder of that lot is in the SW 1/4.

. It was at this particular sale that the improper description of the property began, when Lot 2 was described as being in the SE 1/4 of the NW 1/4. The property is actually 'in the SE 1/4 of the SW 1/4 of the NW 1/4 of Section 5, etc. The mistake was perpetuated in the 1968 sale to Shirley and Frances Hughes. However, despite this mistake, the property could be physically located through the metes and bounds description also contained in the deeds.

. Mr. Wiim later refers to this map and states that it has three lots, all located below Liberty Hill Road, but the copy he had from the assessor’s office only showed Lots 1 and 2.

. This is presumably the Carlisle tract, although no evidence had yet been introduced proving that fact.

.Mr. Carlisle’s deed -from N.Y. Crawley contains toe following language after toe description of toe .property: • "This sale includes a servitude of passage reserved for toe benefit of this lot, of 20 feet in width across toe rear lines of Lots 2 and 3.”

. The quitclaim deed was' dated August 1, 1996, which was actually 13 years after the Hugheses sold the property to the Felkers.

. Because we have affirmed the trial court's finding that the Chances have acquired the property through acquisitive prescription of 10 years, the argument concerning 30-year acquisitive prescription has been pretermit-ted. ■ •